UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| JANET F. ADKINS, | : | Case No. 3:16-cv-50 |
| --- | --- | --- |
| Plaintiff, | : | |
| vs. | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| NANCY A. BERRYHILL, COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : | |
| Defendant. | : | |

# DECISION AND ENTRY

## I. Introduction

Plaintiff Janet F. Adkins brings this case challenging the Social Security Administration's denial of her application for period of disability and Disability Insurance Benefits. She applied for benefits on July 2, 2012, asserting that she could no longer work a substantial paid job. Administrative Law Judge (ALJ) Irma J. Flottman concluded that she was not eligible for benefits because she is not under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. #13), and the administrative record (Doc. #6).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Flottman's non-disability decision.

## II. Background

Plaintiff asserts that she has been under a "disability" since January 23, 2010. She was forty-six years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. § 404.1563(c). She has a limited education. *See id.* § 404.1564(b)(3).

### A. Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Flottman that she stopped working in 2006 because of severe migraines, and pain in her back, right leg, and right shoulder. (Doc. #6, *PageID* #s 103, 105). Plaintiff has migraines three or four times a week. *Id.* at 106-07. When she has a migraine, she cannot stand lights and has to be in a dark room. *Id.* at 106. She gets nauseated, sick to her stomach, and throws up. *Id.* at 106, 123.

Plaintiff's back was fractured and she has scoliosis. *Id.* at 105. She has severe pain in her lower, middle, and upper back and muscle spasms. *Id.* At the time of the hearing, she was getting shots in her back. *Id.* She has also had therapy and used prescription pain patches on her back. *Id.* She takes Tylenol 3 with codeine and a muscle relaxer. *Id.* at 106. Her back goes out about every other week. *Id.*

Plaintiff tore ligaments and tendons in her right knee. *Id.* at 107. As a result, she has sharp pain in her knee, it swells up, and it gives out. *Id.* She had therapy but "they

2

thought that it didn't do any good." *Id.* In addition, Plaintiff's right shoulder has muscle spasms. *Id.* at 107-08. She had therapy for it as well. *Id.* at 108.

Overall, when Plaintiff is not taking pain medication, on a scale from one to ten, her pain is at ten. *Id.* at 119. With medicine, her pain is about seven. *Id.*

Plaintiff sees her family care physician, Dr. Jon Silk, once every three months. *Id.* at 108. She also sees a pain management doctor, Dr. Abraham, and a neurologist, Dr. Ranganathan. *Id.* at 108-09.

Plaintiff suffers from depression and post-traumatic stress disorder. *Id.* at 109. She attends counseling twice a month at a mental health clinic where she has gone for seven years. *Id.* She also sees Dr. Dahar at the clinic once every two months. *Id.* at 110. He prescribed Seroquel, Pristiq, and Abilify. *Id.* Even with medicine, she still has days that she is "really depressed." *Id.* at 120. Once every couple of weeks, Plaintiff has suicidal thoughts. *Id.* at 123.

Plaintiff also experiences panic attacks once a week, lasting from 20 minutes to all day. Id. at 120-21. She has difficulty in crowds of people: "I feel like I'm being smothered. I feel like everything's being closed in on me. … I feel like just everything's falling in." *Id.* at 121. She has crying spells three times a week that last between thirty minutes and a couple hours. *Id.* at 122. Plaintiff sometimes has problems concentrating. *Id.* As a result, she cannot always complete projects. *Id.* On average, she only sleeps three to four hours a night. *Id.*

On an average day, Plaintiff wakes up at 4:00 a.m. and stays in her room in bed all day. *Id.* at 112. She has been doing this for years. *Id.* at 113. She does "very little at

3

home because my body [doesn't] allow me to do a whole lot." *Id*. She makes meals by herself sometimes and other times, her family helps. *Id*. She goes grocery shopping once a month. *Id*. She does not do light housework. *Id*. Approximately once a week, she washes dishes but has to do so a little at a time. *Id.* at 113-14. She also does laundry—usually with help—once a week. *Id.* at 114. Plaintiff is able to drive and she does "once in a while." *Id*. She reads for about thirty minutes every day and plays a game on her computer. *Id.* at 115-16.

Plaintiff testified that her grandchildren are her hobby. *Id.* at 114. She sees them every other weekend and the oldest will sometimes stay with her. *Id.* at 115. Plaintiff generally sees or talks to her family members every week. *Id*.

Plaintiff indicated that she cannot walk very far, not even a block. *Id.* at 110. She can be on her feet, standing or walking, for approximately ten minutes. *Id.* at 111. She has a difficult time climbing stairs. *Id.* at 112. She can sit in a basic office chair for ten minutes. *Id.* at 111. She feels most comfortable lying down. *Id.* at 124. The heaviest she can lift is about twenty pounds. *Id.* at 111. She is able to reach overhead but has a difficult time holding on to objects or handling them with her right hand. *Id*.

### B. Medical Opinions

#### i. Ellen Miller, MS, PCC-S

Ms. Miller, Plaintiff's counselor, completed a daily activities questionnaire in July 2012. *Id.* at 627-28. She indicated she began treating Plaintiff in October 2010. She opined Plaintiff's ability to work might be prevented by her "chronic depressed mood that includes feeling [of] hopelessness [and] worthlessness[,] inappropriate guilt, [and]

withdrawal." She indicated that Plaintiff is capable of food preparation and household chores; she is well-groomed, and her hobby is gardening. However, Plaintiff's husband drives because Plaintiff has had thoughts of suicide while driving—specifically, driving her car into an object.

### ii. Todd Finnerty, Psy.D., & Karla Voyten, Ph.D.

Dr. Finnerty reviewed Plaintiff's records on August 10, 2012. *Id.* at 158-71. He found Plaintiff has four severe impairments: disorders of back—discogenic and degenerative; migraine; affective disorders; and anxiety disorders. He opined she had a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties concentration, persistence, or pace; and no repeated episodes of decompensation. He adopted the mental residual functional capacity in the previous ALJ decision dated January 22, 2010 under Acquiescence Ruling 98-4. 1998 WL 283902 (Soc. Sec. Admin. June 1, 1998); *see Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997).

On Decemeber 7, 2012, Dr. Voyten reviewed Plaintiff's records and affirmed Dr. Finnerty's assessment. *Id.* at 173-87.

### III. Standard of Review

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that

5

precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. § 423(d)(1)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance …." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to

follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV. **The ALJ's Decision**

As noted previously, it fell to ALJ Flottman to evaluate the evidence connected to Plaintiff's application for benefits. She did so by considering each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 404.1520. She reached the following main conclusions:

Step 1: Plaintiff has not engaged in substantial gainful employment since January 23, 2010 through her date last insured, December 31, 2011.

Step 2: She has the severe impairments of degenerative disc disease of the cervical spine, chronic obstructive pulmonary disease (COPD), pulmonary nodules, asthma, an affective disorder, and an anxiety disorder.

Step 3: She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4: Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of the ability to "lift/carry up to 50 pounds occasionally and 25 pounds frequently; stand/walk up to six hours in an eight-hour workday; sit up to six hours in an eight-hour workday. She can crawl and climb ramps and stairs frequently. She can climb ladders, ropes, and scaffolds occasionally. She should avoid concentrated exposure to extreme cold and irritants such as fumes, odors, dust, gases, and poorly ventilated areas. She is limited to simple, routine, and repetitive tasks with no more than occasional changes in the work setting and with no strict production rate or fast-paced work. She can tolerate no more than occasional interactions with co-workers and the public."

7

Step 4: She is unable to perform her past relevant work.

Step 5: She could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 79-92). These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 92.

## V. Discussion

Plaintiff contends that the ALJ's residual functional capacity assessment is not based on substantial evidence because the ALJ misinterpreted evidence and substituted her own opinions for those of the treating physician; failed to consider her persistent pain; and failed to consider the effect of the combination of Plaintiff's impairments on her ability to engage in substantial gainful activity. The Commissioner maintains that substantial evidence supports the ALJ's assessment of Plaintiff's residual functional capacity.

ALJ Flottman found, "mental health records indicate claimant's symptoms improved with treatment from February 2010 (GAF rating of 45) to December 2011 (GAF rating of 55) with notes indicating her major depressive disorder was in remission by April 2012, and she was reporting engaging in extensive activities of daily living by July 2012." (Doc. #6, *PageID* #87) (citation omitted). She recognized, "Nearly one year after the claimant's date last insured, she did experience an acute decline in mental health resulting in inpatient hospitalizations in November 2012 and December 2012. Subsequent treatment notes do reflect claimant's mental status did stabilize with treatment." *Id.* at 87-88 (citations omitted). However, she gave that evidence "no

8

weight" because it occurred almost one year after Plaintiff's date last insured (December 31, 2011). *Id.* at 88.

ALJ Flottman erred in relying on Plaintiff's GAF scores to find Plaintiff's symptoms improved. The ALJ is correct that in July 2010, Erica Morrow, MSW LSW, evaluated Plaintiff and assigned a GAF score of 45. *Id.* at 631. And, in January 2012, Ellen Miller, MS LPCC-S, completed a diagnostic assessment update and assigned Plaintiff a GAF score of 55. *Id.* at 637. But these scores alone fail to convey a full picture of Plaintiff's mental health issues and do not establish that her symptoms improved with treatment. Indeed, "'A GAF score is … not dispositive of anything in and of itself ….'" *Oliver v. Comm'r of Soc. Sec.*, 415 F. App'x 681, 684 (6th Cir. 2011). Both the Commissioner of Social Security and American Psychiatric Association question the reliability of GAF scores. "[T]he Commissioner 'has declined to endorse the [Global Assessment Functioning] score for 'use in the Social Security and [Supplemental Security Income] disability programs,' and has indicated that [Global Assessment Functioning] scores have no 'direct correlation to the severity requirements of the mental disorders listings.''" *DeBoard v. Comm'r of Soc. Sec.,* 211 F. App'x 411, 415 (6th Cir. 2006) (quoting *Wind v. Barnhart,* No. 04–16371, 2005 WL 1317040, at *6 n.5, 133 F. App'x 684 (11th Cir. June 2, 2005); and 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000)). Moreover, the fifth and most recent edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5) no longer uses the GAF scale, in part due to "its lack of conceptual clarity (*i.e.,* including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." Liza H. Gold, *DSM-5*

*and the Assessment of Functioning: The World Health Organization Disability Assessment Schedule 2.0,* 42 J. AM. ACAD. PSYCHIATRY & LAW 173, 174 (2014) (footnote omitted) (*available at* http://www.jaapl.org.  Search by article title).  The recent rejection of the GAF scale by the psychiatric professionals who created it and its lack of direct correlation with the requirements of the Commissioner's mental disorders listings cast too dark a shadow over its reliability for it to serve as a reasonable basis for concluding Plaintiff's symptoms improved.

Further, the record includes detailed accounts of Plaintiff's mental health symptoms.  For example, in July 2010, Plaintiff reported to Ms. Morrow that she was sometimes depressed and feels suicidal.  (Doc. #6, *PageID* #629).  She had thoughts of self-harm and stated that "it may solve some problems for her family is she were not around."  *Id.*  Plaintiff further explained that she does not leave her house very often because of depression; she has panic attacks; and she has bad dreams and nightmares and does not sleep well.  *Id.*  Ms. Morrow diagnosed major depression, recurrent, moderate, and post-traumatic stress disorder.  *Id.* at 631.

Between the July 2010 assessment and the January 2012 assessment, Plaintiff saw Virginia Woodrow, M.D., her psychiatrist, six times.  At the initial evaluation in September 2010, Dr. Woodrow found that Plaintiff was struggling with the deaths of her brothers.  *Id.* at 641.  "She wishes she had died instead of the one that was shot."  *Id.* Additionally, Plaintiff reported having nightmares and difficulty staying asleep.  *Id.*

In March 2011, Dr. Woodrow indicated Plaintiff's thought process was rapid, over inclusive, and rambling.  *Id.* at 650.  She was moderately anxious, moderately depressed,

and on the verge of tears.  *Id.*  She had suicidal thoughts.  *Id.*  Dr. Woodrow observed, in August 2011, that Plaintiff was "nicely dressed but fatigued and crying."  *Id.* at 654.  In November 2011, Plaintiff's "mood, depression, [and] anxiety are better (mild-moderate)[.]"  *Id.* at 656.

Ms. Miller, in January 2012, completed a diagnostic assessment update.  *Id.* at 637.  She did not change Ms. Morrow's diagnoses—major depression, recurring, moderate, and post-traumatic stress disorder.  *Id*.  Plaintiff reported to Ms. Miller that "she has reduced days when she is feeling anxiety and/or depression in the past year."  *Id.* at 625.  But, she continues to have "tearful episodes five times weekly -- something on tv triggers a flashback -- other times flashbacks about someone getting killed …."  *Id.*  Ms. Miller listed only one treatment recommendation/assessed need: "Stabilize mental/emotional [symptoms]."  *Id.* at 638.  This tends to support Plaintiff's assertion that her symptoms were not stable.  Together, these records do not reasonably suggest a significant improvement in Plaintiff's symptoms.

The ALJ also found that by July 2012, Plaintiff "was reporting engaging in extensive activities of daily living …."  *Id.* at 87 (citation omitted).  Substantial evidence does not support the ALJ's finding.  At step 2, ALJ Flottman discussed Plaintiff's activities of daily living:

> In activities of daily living, during the relevant period from January 23, 2010, through the date last insured December 31, 2011, the claimant had no more than a mild restriction.  The claimant testified that she wakes up at 4:00 am, and then stays in her bed most of the time.  She has done this for years.  She eats in her bedroom; her family comes in and out.  She will help prepare meals, using the oven and the stove.  She shops

11

> for groceries about once a month. She does not do much housework, but she will wash dishes once a week. She does laundry once a week, with help. Although they have a yard, she does not mow it or do yard work. She drives occasionally.

*Id.* at 83. These minimal and infrequent activities do not reasonably constitute extensive activities of daily living, as suggested by the ALJ.

The ALJ again addressed Plaintiff's activities of daily living when she discussed Plaintiff's medical records: "treatment notes indicate she walked for exercise and worked in her garden and yard during the relevant period. … After her date last insured, treatment notes indicate she was working in her yard pulling weeds on June 20, 2012." *Id.* at 88 (citations omitted).

The ALJ is correct that treatment notes from Dayton Outpatient Pain Management indicate Plaintiff reporting walking and gardening. For instance, in July 2010, Dr. Nalamada noted Plaintiff "walks for exercise." *Id.* at 407. In October 2010, Dr. Gupta noted that Plaintiff had "[n]o desire to continue living[.]" *Id.* at 415. Notably, Plaintiff reported to Dr. Nguyen in June 2011 that side effects of her current medication include an unsteady gait. *Id.* at 432. She also stated that she walks for exercise and works in her yard. *Id.* at 434-35. In August 2011, Dr. Nguyen notes that Plaintiff "is walking for exercise (2 blocks)." *Id.* at 439. He noted in October 2011 that she stretches for exercise. *Id.* at 443. And, in January 2012, Ms. Miller, under the title "meaningful activities," lists "Activity with granddaughter and adult daughter, gardening, activities with husband." *Id.* at 625.

The record does not establish that Plaintiff "could do any of these activities on *a sustained basis,* which is how the functional limitations of mental impairments are to be assessed.") (emphasis in original) (citing 20 C.F.R. § 404.1520a(c)(2); 20 C.F.R. Part 404, Subpart P, Appendix 1, at 12.00). Further, the fact that Plaintiff's symptoms improve enough at times for her to walk and garden does not lead to a reasonable conclusion that she can return to work. *Cf. Holohan v. Massanari,* 246 F.3d 1195, 1205 (9th Cir. 2001) ("That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace."); *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) ("The administrative law judge's casual equating of household work to work in the labor market cannot stand.").

The ALJ also found "notes indicating her major depressive disorder was in remission by April 2012[.]" (Doc. #6, *PageID* #87). In support, the ALJ cites forty pages of records and in those records, there are only two references to remission. Ms. Morrow, in July 2010, and Dr. Woodrow, in September 2010, diagnosed major depression, recurring, moderate, and post-traumatic stress disorder. *Id.* at 631, 644. Dr. Woodrow, at Plaintiff's next four appointments, indicated in her treatment notes that there is no change in diagnosis. *Id.* at 649, 651, 653, 655. In November 2011, she checked the "no" box, indicating no change in diagnosis, but then, in the area provided for an explanation, listed "MDD, partial rem. PTSD." *Id.* at 657. But, in January 2012, Ms. Miller confirmed Plaintiff's original diagnoses. *Id.* at 637.

The only other evidence referencing remission is an unsigned and undated mental status questionnaire from the Mental Health Clinic that was faxed to the Bureau of Disability Determination on July 27, 2012 that indicates Plaintiff's diagnoses include "Major Depression, partial rem, hx psychotic sx[,] panic D/O[.]" *Id.* at 626. This is likely from Dr. Woodrow, as she saw Plaintiff on that day. *Id.* at 896. However, Dr. Woodrow's treatment notes do not indicate whether there were changes in Plaintiff's diagnosis and do indicate that she was still experiencing significant symptoms. *Id.* at 896-97. For example, Dr. Woodrow indicated Plaintiff's mood/affect was "depressed, hopeless, helpless[,]" and she "denied suicidal [intent or plan] though thinks she would be better off sometimes." *Id.* at 896. In addition, the ALJ only "considered evidence relating to treatment up to six months after the date last insured[,]" and evidence from July 27, 2012 is outside that window of time. *Id.* at 87.

Plaintiff's mental health treatment notes provide a vivid longitudinal picture of her mental health disorders, symptoms, and treatment. Although Plaintiff's symptoms waxed and waned, it is not reasonable to conclude that Plaintiff's mental health symptoms improved. For that reason, the ALJ's assessment of Plaintiff's residual functional capacity is not supported by substantial evidence.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[1]

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that

---

[1] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

14

shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal

criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her application for Disability Insurance Benefits should be granted.

**IT IS THEREFORE ORDERED THAT**:

1. The Commissioner's non-disability finding is vacated;

2. No finding is made as to whether Plaintiff Janet F. Adkins was under a "disability" within the meaning of the Social Security Act;

3. This matter is **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Entry; and

4. The case is terminated on the Court's docket.

Date: September 27, 2017   *s/Sharon L. Ovington*
Sharon L. Ovington
United States Magistrate Judge